UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------x

UNITED STATES OF AMERICA                          :

   -v.-                                              :            15 Cr. 527 (KMW)

IGOR FAINSHTEIN and                               :
YELENA FAINSHTEIN,
  a/k/a "Yelena Baranovich,"                       :
  a/k/a "Yelena Baranovich-Fainshtein,
                                                  :
              Defendants.
                                                  :
-----------------------------------------------------------------x


# THE GOVERNMENT'S SENTENCING MEMORANDUM

PREET BHARARA
United States Attorney
Southern District of New York
Attorney for the United States of America



Daniel C. Richenthal
Assistant United States Attorney
- Of Counsel -

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------------------------------x

UNITED STATES OF AMERICA                    :

   -v.-                                       :        15 Cr. 527 (KMW)

IGOR FAINSHTEIN and                          :
YELENA FAINSHTEIN,
  a/k/a "Yelena Baranovich,"                 :
  a/k/a "Yelena Baranovich-Fainshtein,
                                :

              Defendants.
                                :

----------------------------------------------------------------x

## THE GOVERNMENT'S SENTENCING MEMORANDUM

Sentencing in this matter is scheduled for tomorrow, Tuesday, November 24, 2015, at

9:30 a.m.  The Government respectfully submits this memorandum in connection with that

sentencing and in response to defendant Igor Fainshtein's sentencing memorandum dated

November 16, 2015 ("I.F. Def. Mem.") and defendant Yelena Fainshtein's sentencing

memorandum dated November 19, 2015 ("Y.F. Def. Mem.").[1]

---

[1]    Defendant Yelena Fainshtein filed a redacted version of her memorandum, and separately submitted an unredacted version to the Court and to Government.  The Government does not object to the defendant's redactions, except to the name of her current employer.  Consistent with the First Amendment and common law rights of access to judicial documents, *see, e.g.*, *Lugosch* v. *Pyramid Co. of Onondaga*, 435 F.3d 110, 119-20 (2d Cir. 2006), particularly in criminal cases, *see, e.g.*, *In re New York Times Co.*, 828 F.2d 110, 114 (2d Cir. 1987), and given that the defendant works pursuant to a state physician assistant license, the Government submits that the name of her employer should not be redacted absent the defendant providing a sufficient factual basis for this redaction.

## PRELIMINARY STATEMENT

The defendants made more than $100,000 per year, far above the median household income in New York City, and more than double that in Brooklyn, the borough in which they lived. They lived in an $800,000 home, leased and/or owned multiple cars, and had substantial assets, including fifty percent ownership interests in two pharmacies. But the defendants wanted more, so they cheated. Declining to obtain private health insurance through an employer, they instead signed up their entire family for Medicaid, submitting fraudulent applications filled with falsehoods, including that one or the other were unemployed. And they worked to keep their entire family on Medicaid for years, re-applying multiple times, including by doctoring a pay stub after an application was first rejected, ultimately causing more than $60,000 in public money, designed for the poor, to be diverted to themselves.

For what they did, the defendants have a United States Sentencing Guidelines ("Guidelines") range of 8 to 14 months' imprisonment, as set forth in the United States Probation Office's ("Probation Office") Presentence Investigation Reports ("PSRs"). In order to serve the purposes of sentencing, including promotion of respect for the law and deterrence, the Government respectfully requests that the Court impose sentences within the applicable Guidelines range.

## BACKGROUND

### A. The Defendants' Offense

In or about January 2009, the defendants agreed to submit the first in a series of fraudulent documents to the New York City Human Resources Administration. (Igor Fainshtein PSR ("I.F. PSR") ¶¶ 19-26; Yelena Fainshtein PSR ("Y.F. PSR") ¶¶ 20-27.) In an application submitted that month, defendant Igor Fainshtein requested Medicaid for himself and one of the defendants' two children, falsely claiming, among other things, under penalty of perjury, that (a) he made only few hundred dollars weekly; (b) his wife, defendant Yelena Fainshtein, made nothing; and (c) he had no assets—concealing that he was the co-owner of at least one pharmacy. (I.F. PSR ¶ 19; Y.F. PSR ¶ 20.)

After this application was approved, defendant Yelena Fainshtein submitted an application, requesting Medicaid for herself and the defendants' other child. (I.F. PSR ¶ 21; Y.F. PSR ¶ 22.) In that application, she listed her last name not as Fainshtein, but as her maiden name, Baranovich, and left blank the section that requested her maiden name. (I.F. PSR ¶ 21; Y.F. PSR ¶ 22.) She also falsely claimed, among other things, under penalty of perjury, that (a) her husband, defendant Igor Fainshtein, made only few hundred dollars weekly; (b) she did not work and made nothing; (c) she had no assets; and (d) no one else in the household already received Medicaid. (I.F. PSR ¶ 22; Y.F. PSR ¶ 23.)

Over the next few years, the defendants, who already had far more than the average New Yorker—including fifty percent ownership interests in two pharmacies—continued to live well. They amassed more than $500,000 in liquid assets, sold one property, and purchased another, a $800,000 home in Belle Harbor, New York. (I.F. PSR ¶¶ 17-18; Y.F. PSR ¶¶ 18-19.)

At the same time, they continued to submit fraudulent documents to HRA, year after year, pretending to be indigent, lying about everything from where they lived, to whether they worked, to what they made. (I.F. PSR ¶¶ 24-26; Y.F. PSR ¶¶ 25-27; Complaint 15 Mag. 535 ("Compl.") ¶¶ 20-31, enclosed herewith as Exhibit A.)

The defendants continued to do this, even after HRA began to detect some, but not all, of the truth. In or about October 2011 (the same time during which the defendants purchased their $800,000 home) HRA terminated Yelena Fainshtein's receipt of Medicaid, on the ground that her true income appeared to be higher than the eligibility limit. (Y.F. PSR ¶ 27; Compl. ¶ 26.) Rather than do what she should have done years earlier—obtain private health insurance through her employer for her and her family, as had been and remained available—Yelena Fainshtein instead submitted a new application for Medicaid, in which she enclosed a doctored pay stub. (Y.F. PSR ¶ 27; Compl. ¶¶ 27-28.) The defendants then continued to submit fraudulent documents for years more. (I.F. PSR ¶ 26; Y.F. PSR ¶ 27; Compl. ¶¶ 29-31.)

During the fraud, not only did the defendants cause tens of thousands of dollars in Medicaid funds to be spent on their behalf, but they also frequently had one of Igor Fainshtein's two pharmacies bill Medicaid for the pharmaceutical products they allegedly needed—thus receiving both healthcare paid for by the public, and money from the public for the same healthcare.

The fraud stopped only after (1) HRA *again* terminated Yelena Fainshtein's receipt of Medicaid (Y.F. PSR ¶ 29; Compl. ¶ 35), and (2) New York State declined to permit one of Igor Fainshtein's two pharmacies to bill the Medicaid program on the ground that he appeared to have concealed his ownership of that pharmacy from HRA, and Igor Fainshtein then canceled his receipt of Medicaid (I.F. PSR ¶ 27; Compl. ¶¶ 32-34).

4

**B.      Other Misconduct**

The misconduct for which the defendants stand to be sentenced does not appear to be their only misconduct.

During the same time period in which they were committed their offense, the defendants appear to have taken steps to conceal income and assets from anyone who might be looking, including by having a business bank account directly pay for a personal mortgage, and by depositing and withdrawing tens of thousands of dollars in cash in a manner designed to avoid the filing of a Currency Transaction Report.  (I.F. PSR ¶ 30; Y.F. PSR ¶ 31; Compl. ¶ 37.)

The defendants also appear to have undertaken to conceal assets from the Probation Office.  In his original report of financial information to the Probation Office, Igor Fainshtein declined to include his ownership of one of the two pharmacies he owned while he committed the offense for which he stands to be sentenced.  When questioned about this, he provided an "unsigned closing statement" purportedly indicating that he had sold that pharmacy in May 2013, and reported that he had no further affiliation with that pharmacy.  (I.F. PSR ¶ 73.)  However, when law enforcement served a subpoena on that pharmacy in Spring 2014, an employee stated that Igor Fainshtein was the manager.  (PSR p. 19.)  The Government understands from the Probation Office that Igor Fainshtein also initially declined to acknowledge that he owned a second property, purchased in December 2013, which he admitted purchasing only after being questioned about it.  (*See* PSR ¶ 74.)

## DISCUSSION

**A.     A Guidelines Sentence Is Warranted**

The factors set forth in 18 U.S.C. § 3553(a) weigh in favor of a Guidelines sentence.

*First*, the nature and seriousness of the offense warrants a Guidelines sentence. *See* 18 U.S.C. §§ 3553(a)(1), (2)(A). Public funds are not unlimited. Spending on health care, including Medicaid, is growing. (http://www.cms.gov/Research-Statistics-Data-and-Systems/Statistics-Trends-and-Reports/NationalHealthExpendData/NHE-Fact-Sheet.html.) Faced with tradeoffs, citizens debate where public dollars should be spent, and reasonable limits must be put on programs. The defendants—one of whom owned two pharmacies, and the other of whom is a licensed physician assistant who has worked for years in the healthcare field— decided that they would lie to evade these limits, repeatedly. And they did so notwithstanding that they made far more than the median household income in New York City, and more than double that in Brooklyn, where they lived. (*Compare* I.F. PSR ¶ 76 and Y.F. PSR ¶ 70, *with* http://www.census.gov/censusexplorer/censusexplorer.html.) They also did so notwithstanding owning substantial assets, including an $800,000 home. The money the defendants stole was meant for the poor, not those with white-collar jobs, access to health insurance, and a home worth nearly a million dollars. Crimes like that of the defendants do not just divert public funds from where they are supposed to go, but also breed distrust of public programs generally, and programs meant for the needy in particular. That is all the more true when the crime is lengthy, repeated, and committed by defendants who are far wealthier than the average person.

*Second*, the circumstances of the offense and the need for the sentence imposed to promote respect for the law warrant a Guidelines sentence. *See* 18 U.S.C. §§ 3553(a)(1), (2)(A). The defendants did not commit their offense once, or on a whim. They committed it over time, repeatedly signing and filing fraudulent documents. Indeed, as discussed above, Yelena

6

Fainshtein submitted a new application for Medicaid, backed up by a doctored pay stub, after her prior receipt of Medicaid was terminated when HRA began to detect the truth. The Guidelines do not account for this kind of thoughtful conduct, or for the repeated nature of the defendants' offense. The sentences imposed by this Court should.

*Third*, the history and characteristics of the defendants and the need for the sentence imposed to protect the public from further crimes warrant a Guidelines sentence. *See* 18 U.S.C. §§ 3553(a)(1), (2)(C). While the defendants have no prior convictions, each appears to have engaged in financial misconduct in other ways. (I.F. PSR ¶ 30; Y.F. PSR ¶ 31; Compl. ¶ 37.) And Igor Fainshtein appears to have taken steps to conceal assets from the Probation Office.

*Finally*, the need for deterrence strongly weighs in favor of a Guidelines sentence. *See* 18 U.S.C. § 3553(a)(2)(B). It is all too easy to do what the defendants did. And it is all too profitable. This means that a meaningful sentence is warranted. *See, e.g., United States* v. *Martin*, 455 F.3d 1227, 1240 (11th Cir. 2006) ("Because economic and fraud-based crimes are 'more rational, cool, and calculated than sudden crimes of passion or opportunity,' these crimes are 'prime candidate[s] for general deterrence.' (quoting Stephanos Bibas, *White-Collar Plea Bargaining and Sentencing After Booker*, 47 Wm. & Mary L. Rev. 721, 724 (2005)) (alteration in original)); *United States* v. *Heffernan*, 43 F.3d 1144, 1149 (7th Cir. 1994) ("Considerations of (general) deterrence argue for punishing more heavily those offenses that either are lucrative or are difficult to detect and punish, since both attributes go to increase the expected benefits of a crime and hence the punishment required to deter it."); Francesco, Galbiati & Vertova, *The Deterrent Effects of Prison: Evidence From a Natural Experiment*, 117 J. of Political Econ. 257, 278 (2009) ("Our findings provide credible evidence that a one-month increase in expected punishment lowers the probability of committing a crime. This corroborates the theory of general

deterrence."); *cf., e.g., United States* v. *Naseem*, 07 Cr. 610 (RPP) (S.D.N.Y. May 30, 2008) ("This kind of conduct has been prosecuted before and it doesn't seem to deter people very much. So that is a strong reason to adhere to the guideline calculation[.]").

**B.      The Defendants' Arguments For Probation Are Unpersuasive**

The defendants ask this Court to impose sentences of probation, meaning that their punishment would, effectively, be no punishment at all. They simply would be ordered to re-pay what they stole, and not to engage in misconduct again. They also might be ordered to pay a fine (although the defendants ask only for probation, and appear to contest the imposition of a fine of any size). The Court should reject the defendants' request.

An as initial matter, the sentences they seek would fail to provide for general deterrence. Others need to know that if they commit repeated fraud, for years, stealing more than $60,000 in public money, they will sentenced to a term of imprisonment. And case-specific factors— including the thoughtful nature of the fraud, the repeated nature of the fraud, the steps the defendants took to make it more difficult to detect the fraud, and the vast difference between the defendants' economic circumstances and the circumstances for which Medicaid was designed— warrant such a sentence.

In arguing to the contrary, the defendants suggest that their offense was not what it seems. Igor Fainshtein states that "his actions can be viewed as motivated more by stress associated with his family's condition than by greed." (I.F. Def. Mem. 16.) Yelena Fainshtein appears to agree. (Y.F. Def. Mem. 16.) This is nonsense. Millions of Americans struggle to make ends meet—including millions who earn far less than the defendants, have far less stable jobs, and far fewer assets, if they have any at all—without resorting to crimes. And these defendants were particularly well-positioned to handle the needs of their family, without fraud. They had access to private health insurance, made more than $100,000 a year, lived in an

$800,000 home, and had a fifty percent ownership interest in two pharmacies and meaningful sums of money in multiple bank accounts. Yet they repeatedly and deliberately committed fraud, for years. It is apparent that this conduct was motivated by greed. Not "stress."

Both defendants also suggest that they deserve a sentence of probation because they have the support of family members and friends, who speak well of the defendants. The Government does not doubt the sincerity of those who have written letters to this Court, and it is appropriate for the Court to consider those letters. But that the defendants are kind to certain others does not explain or excuse what the defendants did. What they did, and, in particular, how they did it, warrants meaningful punishment.

Yelena Fainshtein also asserts that she deserves a sentence of probation because "professional licensing consequences . . . will greatly hinder her professional life, livelihood and future employment." (Y.F. Def. Mem. 18.) She does not describe what these consequences are, and omits that she has (a) declined to inform New York State of her guilty plea and (b) retained separate counsel to fight any such consequences. In other words, she is both asking this Court to impose a lower sentence because there may be undefined licensing consequences in her future, and she is doing everything she can to delay and prevent those consequences. She cannot reasonably have it both ways.

In any event, even if this Court were to conclude that the undefined consequences to which Yelena Fainshtein refers will include the loss of her physician assistant license—and she provides no basis for such a conclusion—the loss of a professional license is not punishment. An argument to the contrary, if accepted, would lead to the perverse result that defendants with the greatest professional success would receive the lowest sentences for their crimes, no matter

9

how calculated they were, while defendants with lesser professional success, who committed the same crimes, would receive more severe sentences.

Finally, Yelena Fainshtein states that she engaged in a "voluntary repayment" of approximately $18,000 before her arrest, "thereby acknowledging her wrongdoing and taking responsibility for her actions." (Y.F. Def. Mem. 12.) What she terms a "voluntary repayment" was a result of a legal demand by HRA. And that demand—because the defendants had so well concealed the scope of their fraud, by, among other things, submitting multiple, separate applications, and lying about where they lived, and who they lived with—was for far less than the total loss caused by the defendants. It is apparent that Yelena Fainshtein paid approximately $18,000 because she had to do so, and with the hope that, by doing so, she would avoid HRA looking more closely at what she and her husband had done. Had she wanted to "tak[e] responsibility for her actions," she would have paid more than $60,000, not less than a third of that figure. It took significant work by federal authorities, as reflected by the length and nature of the complaint against the defendants, to uncover the full scope of what they had done.

Moreover, contrary to the impression the defendants appear to seek to create in their submissions, it was only after their guilty pleas that they forfeited the value of the benefits that they fraudulently obtained—and then only after the Government had informed the defendants that, because they had more than sufficient assets to cover their joint and several forfeiture judgments, but had not paid those judgments, the Government expected to commence action to seize assets. Only then did the defendants pay. Further, as noted above, because the defendants frequently had one of Igor Fainshtein's two pharmacies bill Medicaid for the pharmaceutical products they allegedly needed, they received more than just the value of publicly-funded healthcare, and thus more than they have forfeited.

## CONCLUSION

For the reasons set forth above, the Government respectfully requests that the Court impose a sentence for each defendant within the range of 8 to 14 months' imprisonment, a sentence that is sufficient but not greater than necessary to serve the legitimate purposes of sentencing.

Dated:  New York, New York
         November 23, 2015

                                                Respectfully submitted,

                                                PREET BHARARA
                                                United States Attorney


                              By:       s/ Daniel C. Richenthal
                                        Daniel C. Richenthal
                                        Assistant United States Attorney
                                        (212) 637-2109